Filed 9/30/21; Modified and certified for pub. 10/26/21 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOSUE URIBE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>CROWN BUILDING MAINTENANCE CO.,<br><br>    Defendant and Respondent;<br><br><br>ISABEL GARIBAY,<br><br>    Intervener and Appellant. | G057836<br><br>(Super. Ct. No. 30-2016-00839857)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Glenda Sanders, Judge. Motion to dismiss denied. Request for judicial notice denied. Reversed and remanded.

Hunter Pyle Law, Hunter Pyle, Katherine Fiester; Feingberg, Jackson, Worthman & Wasow, Todd Jackson and Genevieve Casey for Intervenor and Appellant.

Outten & Golden, Jahan C. Sagafi, Rachel Williams Dempsey; Teukolsky Law and Lauren Teukolsky for California Employment Lawyers Association, as Amicus Curiae on behalf of Intervenor and Appellant.

Alizadeh Employees Law and Arash N. Alizadeh for Plaintiff and Respondent.

Ogletree, Deakins, Nash, Smoak & Stewart, Cody J. Cocanig, Jack Sholkoff and Douglas J. Farmer for Defendant and Respondent.

Morgan, Lewis & Bockius, Max C. Fischer and Aimee Mackay for California Employment Law Council and Employers Group, as Amici Curiae on behalf of Defendant and Respondent.

*      *      *

Isabel Garibay, an intervenor in the action, appeals from the trial court's entry of judgment confirming final approval of a class action settlement reached between Josue Uribe and Crown Building Maintenance Company (Crown). Uribe initially sued Crown as an individual regarding alleged Labor Code violations for failure to reimburse him for the cost of uniform cleaning and required footwear as a day porter doing janitorial-type work. Uribe's suit also included a cause of action in a representative capacity for civil penalties and injunctive relief under the Labor Code Private Attorneys General Act of 2004 (PAGA). (Lab. Code, § 2698 et seq.)[1] Following stalled dispute resolution efforts, the parties reached a settlement after a daylong private mediation. The settlement was conditioned on Uribe filing an amended complaint converting his lawsuit into a class action on his Labor Code claims and including unreimbursed employee cell phone usage costs as an additional basis for both his Labor Code and PAGA causes of action.

---

[1] All further undesignated statutory references are to the Labor Code.

2

Garibay, an unnamed member of the class once it was formed, had earlier filed in the Alameda County Superior Court a putative class action asserting Labor Code claims for unreimbursed cell phone use by Crown employees, together with a representative PAGA cause of action on that basis. Garibay filed her Alameda County action before Uribe filed his original complaint in the Orange County Superior Court. When Uribe and Crown sought preliminary approval of their agreement to settle Uribe's Orange County lawsuit on a class-wide basis, including settling his representative PAGA claim, the trial court authorized Garibay to intervene as a named party in the lawsuit to oppose the settlement. The trial court later granted Uribe's motion for preliminary approval of the settlement, and then Crown and Uribe's subsequent joint motion for final approval.

Meanwhile, the Judicial Council had referred Crown's petition to coordinate Uribe's and Garibay's lawsuits to the presiding judge of the Alameda County Superior Court to appoint a judge to hear the petition; that appointment remained pending at the time the judgment in Orange County was entered. After the parties advised the trial court in this action that no stay had been entered in the coordination proceedings, the court subsequently entered judgment. Garibay now challenges the settlement after the trial court declined to rule on both Crown's motion to dismiss Garibay's complaint in intervention and Garibay's motion to vacate the judgment.

The parties raise a host of issues in this appeal. Garibay contends Uribe's PAGA notice failed to reference unreimbursed cell phone expenses in any manner, thereby precluding litigation on that basis. Garibay also contends Uribe failed to provide the trial court with basic information necessary to approve the settlement, including a range of settlement values for each settled claim and a range of PAGA penalties on each claim. Garibay further argues the settlement was unfair, and the scope of the release Uribe and Crown negotiated was too broad and no presumption of fairness should apply to the settlement because Uribe's trial counsel had no prior experience in class action

3

litigation; the settlement was not reached through arms-length bargaining and provided no range of settlement values for the trial court to consider; and Uribe was neither typical nor adequate to serve as class representative.

Garibay also contends the trial court should have applied a heightened standard in evaluating the settlement to guard against a "reverse auction," in which a defendant settles with the low bidder among two or more class representatives, to the detriment of the class.[2] Amici curiae, the California Employment Lawyers Association (CELA) and Employers Group, and the California Employment Law Council (CELC) debate on behalf of Garibay and Crown, respectively, whether a heightened standard is necessary or applicable here.

For their part, Crown and Uribe defend the settlement and, as a preliminary matter, contest Garibay's standing to appeal the judgment once she opted out of the class action component of Uribe's lawsuit.

As we explain, we need only address the standing issue and whether Uribe's notice to the state PAGA administrator was adequate to encompass a PAGA claim for unreimbursed cell phone use. Because Garibay has the requisite "immediate, pecuniary, and substantial" interest in preserving and advancing her PAGA cause of action in her lawsuit, which would be extinguished by res judicata if the judgment confirming Uribe and Crown's settlement were to be upheld, she has standing here at least to challenge the settlement's PAGA component.

On the merits, because the "plain meaning" of the stated "facts and theories" disclosed in Uribe's PAGA notice did not encompass a claim for unreimbursed

_____

[2] One court has defined a "reverse auction" in the following manner: "A reverse auction is said to occur when 'the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant.' [Citation.] It has an odor of mendacity about it." (*Negrete v. Allianz Life Ins. Co. of North America* (9th Cir. 2008) 523 F.3d 1091, 1099.)

4

cell phone expenses, the notice was inadequate to support Uribe's PAGA cause of action on that theory in his lawsuit. And because Uribe and Crown's agreement did not allow for severance of nonviable settlement terms—indeed, an express nullity provision provided otherwise—judicial approval of a settlement that includes Uribe's PAGA cause of action cannot survive review. We therefore reverse the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Garibay first became involved in litigation against Crown when she joined an action pending in the Alameda County Superior Court, *Gama v. Able Services, et al.*, 2015, No. RG15773582 (*Gama/Garibay* or *Garibay*). The lawsuit, a proposed class action, had been filed in June 2015, and Garibay joined it as a named plaintiff in the first amended complaint filed in November of that year. The lawsuit asserted proposed class claims for reimbursement of employee cell phone expenses under section 2802, with a corresponding PAGA civil penalty claim. The putative class consisted of almost 16,000 janitors employed by Able Services, Crown Building Maintenance Company, and Crown Building Maintenance doing business as Able Building Maintenance Company in California.

Separately, Uribe, a day porter at a Costa Mesa apartment building maintained by Crown, filed his own individual lawsuit against Crown in the Orange County Superior Court in March 2016. He asserted personal claims against Crown and related Doe entities, which he described as comprising together "America's largest family-owned provider of Janitorial, Engineering, and Facility solutions." Uribe alleged numerous Labor Code violations, including under section 2802 for certain unreimbursed expenses. Specifically, Uribe asserted Crown failed to pay him "reimbursement for [the] cost of maintenance of uniforms or [for] purchasing slip resistant shoes" as part of his wages.

5

According to Uribe's complaint, he "was required to wear a uniform provided by the company, but the company did not maintain the uniform." He laundered it himself, alleging further that, "[d]ue to heavy chemicals that came in contact with Employee's uniform, he had to wash the uniforms in separate wash loads to avoid damaging his personal clothes." Uribe "worked at an apartment complex site and his duties included sweeping, mopping, vacuuming, blowing leaves and other similar tasks." According to Uribe's complaint, his job duties as a day porter were "essentially similar to a janitor."

Uribe's complaint also included a PAGA cause of action, which he brought in a representative capacity "on behalf of himself and other current and former aggrieved employees." He asserted the PAGA claim to redress "the violation of the Labor Code sections alleged in this pleading and the attached PAGA Notice."

Before filing his lawsuit, Uribe filed notice of his PAGA claim with the state PAGA administrator. Uribe's PAGA notice stated the alleged Labor Code violations were "based on the theory that Employee was entitled to reimbursement of expenses incurred for maintaining his uniform and purchasing his own slip resistant shoe[s] that he had no other use or need for other than to perform his job." Uribe described the factual basis of the section 2802 reimbursement claim as follows: "failing to reimburse Employee for Expenses incurred for purchasing slip resistant shoes and maintaining his uniform." The notice identified the dates Uribe worked for Crown before going on disability leave. Uribe sent the notice to the PAGA administrator at the state Labor and Workforce Development Agency (LWDA) in February 2016. Uribe's complaint included no cell phone related claims, and his PAGA notice made no mention of cell phone reimbursement as a basis for his PAGA claim.

Uribe stated in his PAGA notice his intent to "seek[] penalties on behalf of the State of California of which 75% will be kept by the state, while 25% will be available to

aggrieved employees." Uribe noted he would request "all applicable" PAGA relief, including attorney fees.

When the LWDA failed to act on his PAGA claims, Uribe filed his lawsuit. As noted, the complaint alleged a PAGA cause of action, in addition to Uribe's individual claims for Labor Code violations. Broadly stated, the complaint sought unpaid wages, compensation, and damages "to be determined at trial" under the relevant Labor Code provisions, including for "payment of amounts Defendants required P[laintiff] to incur to cover . . . necessary expenditures/losses." Among other relief, Uribe also sought "Labor Code Section 226(e) penalties in the amount of $4,000," other penalties for "violation of PAGA," attorney fees for enforcing "his rights granted by Section 2802" for expense reimbursement, "injunctive relief from Defendants' unfair business practices," including to ensure defendants' compliance with the Labor Code, and, "[i]n the event of default, for judgment in an amount not less than $100,000."

Uribe filed a first amended complaint (FAC) in May 2016 asserting virtually identical claims and requesting nearly identical relief. Like his original complaint, the FAC did not assert class action claims, nor did it make any cell phone related claims; its claims related only to uniform-cleaning and shoes. Uribe attached to the FAC the same PAGA notice he sent the LWDA in February 2016.

Crown informed Uribe it intended to file notice in the trial court of *Gama/Garibay* as a related case. Uribe filed the related case notice, and Crown filed a similar notice as part of its case management statement in *Gama/Garibay*, identifying Uribe's lawsuit in Orange County as a related action. Discovery moved forward in both cases. According to Uribe and Crown, they engaged in "extensive" written discovery in Uribe's lawsuit, including "substantive" meet and confer communications to resolve discovery disputes.

In September 2016, Crown took Uribe's deposition. Uribe testified that day porters and janitors wore tennis shoes on the job rather than specialty shoes. He

7

acknowledged he was told at his orientation that while nonslip footwear was required, tennis shoes could be worn. Photographs exchanged in discovery showed examples of such footwear.

Uribe also testified he usually washed his uniform with his other clothes, although it depended on the type of work he was doing. In response to questioning by Crown's counsel, Uribe acknowledged he could perform his job duties without a cellular phone. He left his phone in his vehicle and "sometimes" saw on his breaks that his manager called; he would then return the call. As a day porter, he could communicate with his manager using a company-provided handheld radio instead of by cell phone.

The parties unsuccessfully discussed settlement over a period of about five months. According to Uribe, when settlement efforts stalled, he requested additional information to add a claim of cell phone reimbursement "consistent with [his] belief that his claims involved the same legal and factual basis as *Garibay*." Crown then proposed mediation and provided Uribe with informal discovery related to his cell phone claim.

The informal discovery included more than 100 documents. Uribe describes them as including information related to Crown's "cell phone reimbursement policies, employee discipline for using a personal cell phone during work, janitor job applications without a personal phone number provided, various property specific agreements that govern cell phone use, collective bargaining agreements containing various expense reimbursement policies, emails reimbursing janitors for personal cell phone use, and an expense reimbursement form with a column for cell phone reimbursement."

Crown also provided Uribe with thousands of cell phone records for 39 company-issued cell phones used at 71 Crown properties. The records reflected, according to Uribe, a three-month period identified by Garibay in discovery in *Gama/Garibay* as "a representative sample" of relevant cell phone use. According to Uribe, the records showed that "only" 321 of 525 janitors received or made a call to a

8

company-issued cell phone; 40 percent of janitors made no such calls. Of the 321 who did, 48.48 percent—almost half—received or made five calls or fewer to a company-issued cell phone during the period. The number of calls received or made by any individual employee during the period ranged from 1 to 177.

According to Uribe, information provided by Crown indicated some janitors shared a phone. Additionally, as to the calls to or from a company-issued phone, it was impossible to determine "whether the content of these conversations is personal or work related."

Crown also provided cell phone records specific to the phones issued to Uribe's supervisors. During the just over two years that Uribe worked for Crown, the records showed 67 calls made to Uribe's personal cell phone number or received from it. On average, this reflected two to three calls a month.

Crown provided a list of 19,068 Crown janitors in the informal discovery. Uribe provides no details about the list or how it was compiled. Crown provided Uribe with information indicating it had collected and maintained 9,240 phone numbers for janitors in its records. That figure included both "cell and land line" numbers, according to Uribe, with no indication in the record as to how many of each.

Uribe and Crown agreed to private mediation before a neutral party they both held in "high[] regard[]" based on his "extensive mediation experience in wage and hour class actions and representative actions." The mediation took place on July 11, 2018 and produced a settlement agreement conditioned on Uribe filing a second amended complaint "to include cell phone claims on [a] class and PAGA basis." The class period was specified "to run from June 2011 to date of final [trial court] approval" of the settlement. The parties agreed the class would consist of "janitors, day porters and other employees who perform cleaning and maintenance."

The settlement called for Crown "to establish [a] gross settlement fund of $370,000.00 to resolve the litigation in its entirety." In exchange, Uribe, as the class

9

representative upon approval by the court, would provide a general release. The agreement specified that the "class claims released" consisted of "claims and causes of action related to expense reimbursement (e.g., Labor Code section 2802) for uniforms and uniform maintenance, safety shoes, and personal cell phone use."

The gross settlement fund included, by express agreement, "attorney fees, costs, enhancements, and claims administration and other costs." The settlement funds were to be distributed based on "claims made" on the settlement fund by class members, rather than a distribution to every member of the class. There was to be "no reversion" to Crown of any undistributed funds. This meant, as Uribe later explained, that "[f]or any unclaimed individual settlement payments, the claims administrator will proportionally increase the individual settlement amount for each participating class member." The parties agreed Uribe would file with the trial court the requisite "motion for preliminary approval" of the settlement and that the settlement was "subject to final terms agreed to by the parties for [the] motion for preliminary approval."

A final term later agreed upon by the parties provided for "Nullification of [the] Settlement Agreement." The nullification clause foreclosed severance of any term or clause in the agreement, including those resolving Uribe's PAGA claim. The nullification clause specified that if "the Court does not finally approve the settlement *as provided herein* [i.e., as in the final agreement]; or [if] the Settlement does not become final for any other reason, then this Settlement Agreement, and any documents generated to bring it into effect, will be null and void." (Italics added.) In that event, "all amounts deposited into the [settlement fund] will be returned to [Crown]." Additionally, "[a]ny order or judgment entered by the Court [would] likewise be treated as void from the beginning."

As Uribe later explained the settlement chronology to the trial court, following the mediation "the parties had the settlement reviewed by Doctor Phillips," an expert retained by Crown. Uribe described the expert as a "well known economist and

10

statistician." According to Uribe, "Doctor Phillips found statistically credible the parties' settlement range."

The parties "then worked on a long form settlement agreement," a process in which, as Uribe recounted, "numerous versions were exchanged until the final form was agreed upon and filed with" the trial court for preliminary approval. The final agreement included the nullification clause noted above. It also specified sums to be deducted up front from the $370,000 settlement fund, including $10,000 "to settle the PAGA penalty" and $10,000 as an "enhancement award[]" for Uribe as the class representative. The agreement also provided for $80,000 in attorney fees for Uribe's attorney as class counsel and approximately $57,000 in settlement administration fees.

The final settlement agreement added some detail to the "claims made" distribution process. Claimants would be paid from the settlement fund according to their tenure with a Crown employer. As Uribe explained, "funds distribution is based on the number of work weeks because an analysis of cell phone records and deposition testimony suggest[s] that janitors are more inclined to suffer greater claims for reimbursement the longer they are employed, i.e., more days to wash clothes, more shoes to purchase and more opportunities to be contacted on a personal phone." Uribe calculated that the settlement would yield a payment of approximately $2 per week worked to each employee making a claim on the settlement. The average pretax settlement award would be about $160 and the highest would be $371.

For Uribe, the settlement formula translated to what he characterized as "not . . . a significant damage amount" of "less than $300." Accordingly, for his "considerable amount of time" litigating the matter, he explained to the trial court that his "only incentive in continuing this case is the $10,000 enchantments [*sic*]" he requested.

Based on the foregoing terms, including an expanded release agreement, Uribe filed a motion in November 2017 requesting the trial court's preliminary approval so that prospective class members could be notified of the proposed settlement.

11

According to Garibay, she had "aggressively" litigated the *Gama/Garibay* proposed class action in the Alameda County Superior Court to that point. Her efforts "include[ed] serving multiple rounds of discovery, noticing relevant depositions, and successfully moving to compel production of a class list and other key documents that the *Gama/Garibay* [d]efendants refused to produce." According to Garibay, she had scheduled depositions of the "defendants' designated Persons Most Qualified witnesses and of several supervisors of putative class members," but the defendants informed her they would not produce the witness because they intended to seek approval of a class settlement in Uribe's Orange County litigation (the *Uribe* action).

On February 2, 2018, the *Uribe* court granted Garibay's request to intervene as a named party in the action. Upon intervening, Garibay filed a motion for an order to deny preliminary approval of the proposed settlement. Uribe opposed Garibay's motion, and Crown filed a brief in support of the preliminary approval motion.

The trial court continued the hearings on Uribe's motion for preliminary approval and Garibay's motion to deny preliminary approval, directing Uribe and Crown to first answer a detailed set of 12 questions. Some of the court's questions included: "Why is this a 'claims made' settlement?"; "What is the estimated average payment by class member?"; and "Why does the settlement period extend back more than four years before the filing of this action?" The court also asked, "Given his sworn deposition testimony . . . , can Plaintiff be an adequate class representative for either the uniform or cell phone claims?" Similarly, the court noted the "the potential lack of commonality" among claimants that Uribe had cited as a litigation "risk" justifying both a lower settlement range and rendering any settlement a tangible benefit against uncertain odds. With this "potential lack of commonality" issue, however, the court asked whether certification was appropriate at all, i.e., "can the Court provisionally certify the class for settlement purposes?"

12

Other questions required Uribe and Crown to provide "more detailed specifics (including dates, times and method) regarding the investigation done into the cell phone claims." The court inquired about claims administration logistics, asking whether, as to uncashed checks in a first round of distribution, "Does this mean second checks will be sent to everyone who cashed their first check?"—thus potentially necessitating "a third round of checks" for the same reason.

The court also expressed concern about the "proposed release language and terms, . . . particularly [that] the scope of the release far exceeds the claims made in the action."

When Uribe and Crown filed a joint brief responding to the court's questions, the court ordered them to file a revised settlement agreement they had elsewhere referenced, which contained a narrowed release. Garibay objected to the revised agreement. After the court heard argument in June 2018, it again directed Uribe and Crown to narrow the release, and authorized Uribe to file the second amended complaint required by the settlement agreement. Following continued hearings, the court granted Uribe's motion for preliminary approval on October 19, 2018.

The claims administrator mailed notice of the proposed settlement to putative class members in December 2018, with a February 2019 deadline for submission of claims, objections, or to request exclusion from the class. The notice specified that prospective class members could object to the settlement or opt out of the litigation, but not both. Almost 1400 class members submitted claim forms by the deadline (1,376). According to Uribe, this represented "a very high participation rate for a transient class." No one filed objections to the proposed settlement terms. Four individuals, including Garibay, opted out.

Once the class election period closed, Uribe and Crown filed a joint motion for "Final Approval of Class Action and Representative Action Settlement" in February 2019. The trial court held a hearing on the motion on March 8, 2019. Crown

13

argued at the hearing that the court "lacks jurisdiction to hear arguments" from Garibay as an intervenor. Crown pointed to the notice mailed to the class members "stat[ing] that if you ask to be excluded, you will not get any settlement payment, and you cannot object to the settlement." Crown argued, "So [the] intervenor, they didn't object to the settlement. They opted out. They asked to be excluded," and thereby "chose the option to opt out to pursue a separate lawsuit."

The court was not persuaded, responding, "But I would stop you there, counsel, because the very reason I allowed the intervenor to intervene is so that [s]he would have an opportunity to address the court as a party—[s]he is a party before me as an intervenor." The court added, "Another reason I allowed the intervention is that [s]he has a right to appeal. [¶] . . . [¶] So if [s]he has a right to appeal any judgment I sign, then [s]he certainly has a right to address me."

The trial court subsequently granted the motion for final approval of the settlement, despite Garibay's opposition. The court also granted Uribe's attorney fees motion and approved a class representative award of $5,000 for Uribe.

Crown thereafter moved to dismiss Garibay's complaint in intervention before the court entered judgment on its final approval of the settlement. At the hearing on the motion, the parties discussed the fact that, before the court granted final approval, Crown had filed a petition with the Judicial Council requesting coordination of the *Gama/Garibay* and *Uribe* actions. (Cal. Rules of Court, rule 3.521 [coordination petition to be filed with Chair of Judicial Council "to determine whether the coordination of certain actions is appropriate"].)

Crown filed the petition the month before the final approval hearing based on its concern regarding "conflicting obligations on our part as defendant," with Garibay having sought discovery in the Alameda County action while Crown pursued final settlement approval of Uribe's Orange County lawsuit.

14

The parties informed the trial court that the Judicial Council authorized the presiding judge of the Alameda County Superior Court to assign a judicial officer to hear Crown's coordination petition (Cal. Rules of Court, rule 3.524(a)), but that assignment remained pending at the time of the hearing on Crown's motion to dismiss Garibay as an intervenor in the *Uribe* action. The trial court observed at the hearing "there's a positive step toward coordination, which was not before me the last time we met" and "the Chief Justice . . . does not appoint coordination judges lightly." The court raised the possibility that, assuming it subsequently entered judgment based on its final settlement approval, "Garibay could bring a motion to vacate," so long as the coordination petition remained pending. The court also contemplated the possibility that Garibay "cannot bring a motion to vacate because Garibay has opted out."

In this posture, the court queried regarding the motion to dismiss Garibay as an intervenor, "[I]s it not the better approach that I don't take any action? You're not prejudiced if I don't take any action. And we wait for the coordination judge that defendants themselves have sought to decide any issues here on out." The court also observed that there appeared to be "no stay imposed" on the *Uribe* or *Gama/Garibay* proceedings while the coordination petition was pending.

In response, counsel for Garibay told the court that Crown "asked the Judicial Council to stay *Gama* only and to allow this case to continue." Counsel advised the court that Garibay had "not yet filed a response to the coordination petition," but noted Garibay's position that "it would be inappropriate to stay one of the two cases while allowing the other one to continue." Counsel confirmed that "the stay issue has not been decided yet, but presumably will be decided once the whole [coordination] petition package is assigned to a judge."

Among the arguments Garibay made opposing dismissal of her complaint in intervention, she referenced her PAGA cause of action in *Gama/Garibay*. She argued she "has obligations on her own behalf and on behalf of the state as a PAGA

15

representative in the *Gama* action. [¶] And this settlement potentially compromises the state's interest in her pursuing those claims in *Gama*. If to the extent defendants or the plaintiff here, you know, seek to imply that her PAGA rights are extinguished by virtue of this settlement, despite the fact that she has opted out."

The trial court took the motion to dismiss Garibay as an intervenor under submission, as it did Garibay's ensuing motion to vacate final approval of the settlement, ruling on neither. The trial court subsequently entered judgment based upon the settlement. Garibay now appeals.

## DISCUSSION

1.  *Standing*

Crown challenges Garibay's standing to appeal the trial court's judgment approving settlement of Uribe's class action Labor Code claims and his PAGA claims made in a representative capacity. Crown argues that because Garibay "opted out of the settlement, she is not bound by the [j]udgment she now seeks to appeal," and thus cannot be aggrieved by it. Lending support to Crown's motion to dismiss the appeal, Uribe argues that "[i]ntervenor opted out which moots any assertions that she has been aggrieved or that she has standing." Because Garibay "is not an aggrieved party" according to respondents, they reason that she "lacks standing to prosecute this appeal."

For her part, Garibay emphasizes her party status as an intervenor. She observes that, "as an [i]ntervenor she is a party of record"—which she contends alone "is *the* key to determining whether an unnamed class member may appeal a settlement." (Italics added.) According to Garibay, the Supreme Court recently "clarified that standing adheres to an unnamed party who either intervenes or files a motion to set aside the judgment in a class action." (Citing *Hernandez v. Restoration Hardware* (2018) 4 Cal.5th 260, 282 (*Hernandez*).)

16

In *Hernandez*, the Supreme Court hewed to the longstanding California rule that "unnamed class members do not become parties of record under [Code of Civil Procedure (CCP)] section 902 with the right to appeal the class settlement, judgment, or attorney fees award unless they formally intervene in the class litigation before the action is final." (*Hernandez*, *supra*, 4 Cal.5th at p. 263.) The Supreme Court observed that the right to appeal, which "is entirely statutory," is generally limited to parties of record, and that the appellant there had undertaken neither of two ways to become one—intervention or by a motion to vacate the judgment (*id.* at p. 267): "Had Muller properly intervened in the class action or filed a [CCP] section 663 motion to vacate the judgment, and been denied relief, she would have had a clear path to challenge the attorney fees award (or settlement or judgment) on appeal." (*Hernandez*, at p. 273.) The appellant having failed to do so, the high court upheld dismissal of her appeal by the Court of Appeal. (*Ibid.*)

Here, Garibay intervened in the action, but becoming a party of record does not suffice to vest a party with appellate standing. *Hernandez* recognized as much in citing the statutory requirement granting the right of appeal to "[a]ny party *aggrieved*." (Code Civ. Proc., § 902, italics added.) "Only a party aggrieved by a judgment or order has standing to appeal the judgment or order." (*Serrano v. Stefan Merli Plastering Co., Inc.* (2008) 162 Cal.App.4th 1014, 1026.)

A party is "'aggrieved'" for purposes of appeal if his or her rights or interests are "injuriously affected" by the judgment. (*County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737 (*County of Alameda*); *Crook v. Contreras* (2002) 95 Cal.App.4th 1194, 1201.) The rights or interests "injuriously affected" must be "'"immediate, pecuniary, and substantial and not nominal or a remote consequence of the judgment."'" (*County of Alameda*, at p. 737; *Howard Contracting, Inc. v. G. A. MacDonald Construction Co.* (1998) 71 Cal.App.4th 38, 58.)

"The issue of whether a party has standing to appeal is a question of law." (*Estate of Bartsch* (2011) 193 Cal.App.4th 885, 890.) We "liberally construe standing

and resolve all doubts about it in favor of the right to appeal." (*Vitatech Internat., Inc. v. Sporn* (2017) 16 Cal.App.5th 796, 804.)

Crown's reliance on the fact that Garibay opted out of the class action settlement overlooks the effect of the settlement on her PAGA claim in her own action. A defining feature of the class action procedure is that "a class member [may] opt out of the class if he or she does not wish to be bound by the result of the suit." (*Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 474.) Individuals who opt out of class litigation generally may "'pursue their own independent remedies, such as negotiation with defendants, initiation of their own action, or intervention in some other action.'" (*Villacres v. ABM Industries Inc.* (2010) 189 Cal.App.4th 562, 582.)

Despite Crown's argument to the contrary, PAGA actions do not afford the same opt out feature. A plaintiff "cannot opt out of [a PAGA] settlement and thereafter pursue civil penalties for the same violations again on behalf of the LWDA." (*Robinson v. Southern Counties Oil Co.* (2020) 53 Cal.App.5th 476, 483.) Unlike the framework governing class actions (Code Civ. Proc., § 382; Cal. Rules of Court, rules 3.760-3.771), "PAGA has no notice requirements for unnamed aggrieved employees, nor may such employees opt out of a PAGA action." (*Baumann v. Chase Investment Services Corp.* (9th Cir. 2014) 747 F.3d 1117, 1122.) Instead, a PAGA judgment "is binding not only on the named employee plaintiff but also on government agencies and any aggrieved employee not a party to the proceeding." (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 985 (*Arias*).)

PAGA provides for substantial penalties of up to "one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation." (§ 2699, subd. (f)(2).) It also provides for distribution of up to 25 percent of the penalty "to the aggrieved employees." (*Id.*, subd. (i).) According to Garibay, Crown's penalty liability for unreimbursed cell phone expenses exceeded $10 million, yet

18

Uribe was willing to settle them for only $10,000. An employee prevailing in a PAGA action is also entitled to "an award of reasonable attorney's fees and costs, including . . . filing fee[s]." (*Id.*, subd. (g)(1).)

Under these circumstances, where Garibay's lawsuit predated Uribe's and she has invested substantial time and resources in pursuing her PAGA cause of action, she is injuriously affected by the judgment confirming settlement of her PAGA claim for far less than she asserts it is worth. Her injury is "'"immediate, pecuniary, and substantial"'" in that, with the judgment in place, all her efforts are wasted, and she has no recourse to recover what are no doubt substantial attorney fees and filing costs incurred. (*County of Alameda*, *supra,* 5 Cal.3d at p. 737.) As one court has explained, the "'prejudice'" giving rise to standing arises when "'the settlement strips the party of a legal claim or cause of action.'" (*Mayfield v. Barr* (D.C.Cir. 1993) 985 F.2d 1090, 1093.) With her own PAGA cause of action precluded if Uribe's PAGA settlement stands, Garibay has standing in this matter to at least challenge Uribe's PAGA notice, in an attempt to set aside the judgment.[3]

2.     *PAGA Notice*

Garibay contends Uribe's PAGA notice was deficient in that it failed to state or even mention unreimbursed use of employees' personal cell phones as a basis for his PAGA claim. She argues that absent a minimum statement of requisite "facts and theories" regarding unreimbursed cell phone usage, Uribe did not preserve the claim as a basis for his PAGA cause of action. We agree.

PAGA "deputize[s] 'employees harmed by labor violations to sue on behalf of the state and collect penalties, to be shared with the state and other affected employees.'" (*Brown v. Ralphs Grocery Co.* (2018) 28 Cal.App.5th 824, 834 (*Brown*).)

---

[3]     We therefore deny Crown's motion to dismiss Garibay's appeal for lack of standing.

19

"Before bringing a civil action for statutory penalties, an employee must comply with Labor Code section 2699.3." (*Arias, supra*, 46 Cal.4th at p. 981.) That section "requires the employee to give written notice of the alleged Labor Code violation to both the employer and the [LWDA], and the notice must describe facts and theories supporting the violation." (*Ibid*.) "Proper notice under section 2699.3 is a 'condition' of a PAGA lawsuit." (*Brown*, at p. 835, quoting *Williams v. Superior Court* (2017) 3 Cal.5th 531, 545 (*Williams*).)

Section 2699.3, subdivision (a), specifies that an employee's civil action for redress of violations alleged in "any provision listed in Section 2699.5 shall commence *only after* the following requirements are met . . . ." (Italics added.) Among those requirements is that notice of the alleged violations must be given to "the Labor and Workforce Development Agency and . . . to the employer of the specific provisions of this code alleged to have been violated, including the facts and theories to support the alleged violation." (§ 2699.3, subd. (a)(1)(A).) Section 2802, the code provision requiring indemnification for employee's expenses and losses in discharging duties, and upon which Uribe subsequently based his PAGA cause of action for unreimbursed expenses, is among those listed in section 2699.5 requiring adherence to the notice requirement.

In *Williams*, the Supreme Court addressed the notice requirement in the context of whether a PAGA plaintiff must have "some modicum of substantial proof before proceeding with discovery." (*Williams*, *supra*, 3 Cal.5th at p. 545.) The court concluded: "Nothing in . . . section 2699.3, subdivision (a)(1)(A), indicates the 'facts and theories' provided in support of 'alleged' violations must satisfy a particular threshold of weightiness, beyond the requirements of nonfrivolousness generally applicable to any civil filing. (See Code Civ. Proc., § 128.7.)" (*Williams*, at p. 545.) Reasoning further, the court explained: "The evident purpose of the notice requirement is to afford the relevant state agency, the [LWDA], the opportunity to decide whether to allocate scarce

20

resources to an investigation, a decision better made with knowledge of the allegations an aggrieved employee is making and any basis for those allegations. Notice to the employer serves the purpose of allowing the employer to submit a response to the agency (see [ ] § 2699.3, subd. (a)(1)(B)), again thereby promoting an informed agency decision as to whether to allocate resources toward an investigation. Neither purpose depends on requiring employees to submit only allegations that can already be backed by some particular quantum of admissible proof." (*Williams*, *supra*, 3 Cal.5th at pp. 545-546.) As stated by another court, the purpose of the notice provision is to "'allow[ ] the [LWDA] to act first on more "serious" violations such as wage and hour violations and give employers an opportunity to cure less serious violations.'" (*Caliber Bodyworks, Inc. v. Superior Court* (2005) 134 Cal.App.4th 365, 375, disapproved on another ground in ZB, N.A. v. Superior Court (2019) 8 Cal.5th 175, 196, fn. 8.)

 *Williams* thus identifies a minimum standard of "nonfrivolousness" in the requisite "'facts and theories'" that must be stated in a PAGA notice to support a PAGA claim. (*Williams*, *supra*, 3 Cal.5th at p. 545.) *Williams* also "recognized the distinction in the notice provision between the alleged violation (i.e., 'the allegations an aggrieved employee is making') and the facts and theories to support the alleged violation (i.e., 'any basis for those allegations')." (*Brown*, *supra*, 28 Cal.App.5th at p. 836.) In other words, "facts and theories," however minimal, are an indispensable component of an adequate PAGA notice.

 Put another way, "something more than bare allegations of a Labor Code violation" is necessary to constitute adequate notice. (*Brown*, *supra*, 28 Cal.App.5th at p. 836.) Mere code section references with prose excerpting or rephrasing the statutory language are "insufficient because they simply paraphrase[] the allegedly violated statutes." (*Id.* at p. 837.) Instead, "the plain meaning" of the phrase "'facts and theories to support [the] alleged violation'" indicates that plaintiffs are "required to put forward

21

sufficient facts to support their claims of labor violations." (*Cardenas v. McLane FoodServices, Inc.* (C.D.Cal. 2011) 796 F.Supp.2d 1246, 1260.)

*Brown* is instructive. There, the court considered the "2009 Notice" the plaintiff gave the LWDA before filing suit. *Brown* found the notice was deficient because, "with one exception, the 2009 Notice was a string of legal conclusions that parroted the allegedly violated Labor Code provisions. It did not state facts and theories supporting the alleged violations not implied by reference to the Labor Code. The notice did not give sufficient information for the LWDA to assess the seriousness of the alleged violations and decide whether to allocate scarce resources to an investigation, or for defendants to determine what policies and practices were being complained of, have an opportunity to cure the violations, and prepare a meaningful response." (*Brown*, *supra*, 28 Cal.App.5th at pp. 837-838.)

The same is true here as to the unreimbursed cell phone claim Uribe omitted altogether from his PAGA notice. Uribe's bare reference to section 2802 and its indemnification requirement was insufficient to preserve a PAGA claim as to cell phone usage because his notice stated no "facts" whatsoever as to that "theor[y]" of an alleged PAGA violation. (§ 2699.3, subd. (a)(1)(A).)

The single exception *Brown* identified in that case is also instructive: "The one exception is the allegation of violations of section 226, subdivision (a), requiring employers to maintain accurate and complete wage statements. That allegation adds: 'The violations include, without limitation, the failure to include the name and address of the legal entity that is the employer.' This minimal fact supports the alleged violation, making the 2009 Notice adequate for the alleged violation of section 226, subdivision (a)." (*Brown*, *supra*, 28 Cal.App.5th at p. 838.)

Here, in addition to citing section 2802, Uribe in his PAGA notice did provide underlying "facts and theories" for his claim, at least insofar as claiming Crown violated the statue "by failing to reimburse Employee for Expenses incurred *for*

22

*purchasing slip resistant shoes and maintaining his uniform*." (Italics added.) But notice regarding "shoes" and "uniform" cannot be stretched to include unreimbursed cell phone use. Uribe's PAGA notice is devoid of any facts or theories relative to that later claim.

While the requisite facts and theories stated in a PAGA notice are "minimal," as exemplified in *Brown* by one line mentioning the absence of the employer's name and address on wage statements, the requirement is real. Absent adhering to section 2699.3, subdivision (a)(1)(A)'s mandate requiring notice of "facts and theories" underlying a PAGA claim, Uribe's notice could be expanded beyond recognition to include "claims for tools, cleaning supplies, automobile or mileage expenses, and more," as Garibay observes. By omitting reference to cell phone claims altogether, Uribe's notice "did not give," like the deficient notice in *Brown*, "sufficient information for the LWDA to assess the seriousness of the alleged violations and decide whether to allocate scarce resources" to it. (*Brown*, *supra*, 28 Cal.App.5th at pp. 837-838.) In omitting entirely any facts or theories as to cell phone use, Uribe's PAGA notice was deficient on that score; it was therefore inadequate to furnish grounds for Uribe to sue on that basis.

Having no basis to sue on that ground, any settlement Uribe reached with Crown could not include settlement of PAGA claims for unreimbursed cell phone costs, and the trial court could not enter judgment confirming such a settlement.

3.    *Remedy*

Because reversal is required concerning Uribe's purported settlement of PAGA claims involving unreimbursed cell phone use, we need not address the other issues raised by the parties. Those issues are mooted by the fact that, under the express terms of Uribe and Crown's agreement, the settlement is a nullity without the PAGA component.

As noted above, Crown and Uribe included in their settlement terms a provision for "Nullification of [the] Settlement Agreement." The nullification clause

23

foreclosed severance of any term or clause in the agreement, including those resolving Uribe's PAGA claim. The nullification clause specified that if "the Court does not finally approve the Settlement *as provided herein* [i.e., as in the final agreement]; or [if] the Settlement does not become final for any other reason, then this Settlement Agreement, and any documents generated to bring it into effect, will be null and void." (Italics added.) In that event, "all amounts deposited into the [settlement fund] will be returned to [Crown]." Additionally, "[a]ny order or judgment entered by the Court [would] likewise be treated as void from the beginning."

Because reversal is required based on Uribe's lack of authority to assert and settle PAGA claims involving unreimbursed cell phone use, and because the settlement agreement cannot stand without that PAGA component, we reverse the judgment.[4]

---

[4] We therefore deny as moot amicus curiae CELA's request for judicial notice of various court documents and a continuing legal education Power Point presentation on damages.

24

## DISPOSITION

The judgment is reversed, and the matter is remanded to the trial court for further proceedings.  Garibay is entitled to her costs on appeal.


GOETHALS, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JOSUE URIBE,<br><br>     Plaintiff and Respondent,<br><br>          v.<br><br>CROWN BUILDING MAINTENANCE CO.,<br><br>     Defendant and Respondent;<br><br><br>ISABEL GARIBAY,<br><br>     Intervener and Appellant. | G057836<br><br>(Super. Ct. No. 30-2016-00839857)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING, CERTIFYING OPINION FOR PUBLICATION<br><br>[NO CHANGE IN JUDGMENT] |

Intervenor and Appellant Isabel Garibay requests that our opinion filed on September 30, 2021, be certified for publication, as multiple nonparties also request, including the California Labor Commissioner.  It appears that our opinion meets the standards set forth in California Rules of Court, rule 8.1105(c).  The opinion is therefore ordered to be published in the Official Reports as modified below.

The opinion is modified as follows:

1.      On page 16, at the end of the first paragraph under the "*Standing*" heading, after the last sentence ending "she 'lacks standing to prosecute this appeal,'" add as new footnote 3 the following text:

> In a rehearing petition, Crown relies in part on *Turrieta v. Lyft, Inc.* (B304701, Sep. 30, 2021) __ Cal.App.5th __ [2021 Cal.App. Lexis 815] (*Turrieta*), which coincidentally was filed the same day as our originally unpublished decision in this case. As we explain, *Turrieta* is distinguishable.

2.      On page 18, in the second new paragraph on the page, delete the first sentence of the paragraph beginning with the words "Crown's reliance" and substitute the following new sentence:

> Crown's reliance on the fact that Garibay opted out of the class action settlement overlooks the effect of the settlement, and ensuing judgment, on the PAGA claim she asserted in her complaint in intervention in this action.

3.      On page 18, at the end of the second new paragraph on the page and following the citation to *Villacres v. ABM Industries Inc.*, add a new sentence and citation as follows:

> PAGA actions do not afford the same opt out feature. A plaintiff "cannot opt out of [a PAGA] settlement and thereafter pursue civil penalties for the same violations again on behalf of the LWDA." (*Robinson v. Southern Counties Oil Co.* (2020) 53 Cal.App.5th 476, 483.)

4.      On pages 18 and 19, delete the paragraph beginning with the words "Despite Crown's argument to the contrary" and further delete the remaining two paragraphs concluding the "*Standing*" section of the opinion, namely the two paragraphs beginning respectively with "PAGA provides for substantial penalties" and "Under these circumstances." In deleting the third paragraph, also delete the footnote in the paragraph, including the footnote text that begins: "We therefore deny . . . ."

2

5.      On page 18, in place of the three paragraphs and footnote deleted in modification #4, substitute the following three new paragraphs and new footnote 4:

Here, the trial court granted Garibay's motion for leave to file a complaint in intervention when Uribe "sought, in connection with [Uribe and Crown's proposed] settlement, to file a second amended complaint that expands Uribe's claims to include the cell phone claims." Previously, as the court observed, Uribe's "complaint in this action assert[ed] a failure to reimburse for uniform costs while Garibay's claims in the Alameda action center on an alleged failure to reimburse for work-related cell phone expenses." Garibay's complaint in intervention in this matter, filed at the trial court's direction, expressly stated a PAGA claim as its third cause of action. Under these circumstances, Garibay has standing to appeal because, having intervened and yet unable to opt out of the other parties' settlement of Uribe's PAGA claim, Garibay's PAGA cause of action in this same lawsuit was resolved against her by the trial court's entry of judgment on its final approval of the settlement. She is therefore a party "aggrieved" by the judgment. As one court has explained, the "prejudice" giving rise to standing arises when "'the settlement strips the party of a legal claim or cause of action.'" (*Mayfield v. Barr* (D.C.Cir. 1993) 985 F.2d 1090, 1093.)

*Turrieta* is not to the contrary. There, the reviewing court held that PAGA plaintiffs *in a separate civil action* lacked standing to bring motions to vacate a judgment (CCP, § 663) approving a class action settlement that included PAGA claims, and therefore "cannot use [denial of] those motions as a basis for appeal." (*Turrieta*, *supra*, __ Cal.App.5th at p. __ [2021 Cal.App. Lexis 815 at p. *18].) Fundamentally, the reviewing court concluded that PAGA plaintiffs in another action "are not aggrieved parties with standing to seek to vacate the judgment or appeal" because "it is the state's rights, and not [the putative] appellants', that are affected by a parallel PAGA settlement." (*Id.*, at p. __ [2021 Cal.App. Lexis 815 at p. *22].) The *Turrieta* court also upheld the trial court's denial of the third-party plaintiffs' motions for mandatory or permissive intervention under CCP section 387. *Turrieta* recognized that PAGA "deputizes 'aggrieved' employees to bring a representative lawsuit on behalf of the state to enforce labor laws [citation]" (*Turrieta*, at p. __ [2021 Cal.App. Lexis 815 at pp. *15-16]), but held that does not *require* a trial court to grant mandatory or permissive intervention in another action.

*Turrieta* is distinguishable because the trial court here granted Garibay's motion for leave to file a complaint in intervention. In fact, the trial court twice denied Crown's ex parte requests for a ruling on its motion

3

to dismiss Garibay as an intervenor, and neither Crown nor Uribe appealed the court's decision to maintain Garibay in the action, which we therefore must presume was correct.[4]  Here, with her own PAGA cause of action in this action precluded if Uribe's PAGA settlement stands, Garibay has standing to at least challenge Uribe's PAGA notice, in an attempt to overturn the judgment.  We therefore deny Crown's motion to dismiss Garibay's appeal for lack of standing.

There is no change in the judgment.

Respondent's petition for rehearing is DENIED.

---

[4]  We observe that the statutory basis for permissive intervention is not just "an interest in the matter in litigation," but "in the success of either of the parties, or an interest against both."  (CCP, § 387, subd. (d)(2).)  In its motion to dismiss Garibay's appeal, Crown claims the trial court was "inclined" to grant its motion to dismiss Garibay as an intervenor, but speculates the court did not do so solely because of the pending coordination petition.  We are not convinced.  Crown does not contend the trial court erred in permitting Garibay's intervention or in declining to remove her.  The record indicates that the trial judge, an experienced and respected jurist with extensive experience in class action matters, expressed broad concerns that prompted her to allow Garibay to intervene and later to remain in the case.  Those concerns included the court's ability to consider Garibay's evidence regarding fair settlement terms (including PAGA penalties) for the cell phone claims, the adequacy of the representation of all class members, and ensuring that the propriety of the settlement could be tested on appeal.  Because the record is not fully developed in these areas, we decline to reach any unstated or oblique suggestion of error included in Crown's motion to dismiss related to the trial court's intervention rulings.

GOETHALS, J.

WE CONCUR:


O'LEARY, P. J.


BEDSWORTH, J.